LITTLE (HALL v.). See Case No. 5,939.

LITTLE (McDONALD v.). See Case No. 8,-760.

LITTLE (PARK v.). See Case No. 10,715.

LITTLE (PATRIOTIC BANK v.). See Case No. 10,809.

LITTLE (SMITH v.). See Case No. 13,072.

———

## Case No. 8,396.

### LITTLE v. UNITED STATES.

[Hoff. Land Cas. 325.] [1]

District Court, N. D. California. Dec. Term, 1857.

MEXICAN LAND GRANT — GENERAL TITLE — TO WHOM ISSUED—OCCUPATION AND CULTIVATION.

The claim must be rejected, because the proof fails to establish that Josefa Martinez, the assignor of claimant, was one of those in whose favor the so-called general title issued, or that she occupied or cultivated the land claimed.

[1] [Reported by Numa Hubert, Esq., and here reprinted by permission.]

Claim [by Milton Little] for five leagues of land in Yolo county, rejected by the board, and appealed by the claimant.

Thornton & Williams and Albert Packard, for appellant.

P. Della Torre, U. S. Atty., and Peyton & Duer, for appellee.

HOFFMAN, District Judge. The claim in this case is under the general title of Micheltorena. This title is as follows: "The supreme departmental government not being able to extend, one by one, the respective titles to all the citizens who have petitioned for lands, with a favorable information from Don Augustus Sutter, captain and judge in charge of the jurisdiction of New Helvetia and Sacramento, I, in the name of the Mexican nation, by these letters confer upon them and their families the lands described in their applications and maps, to all and each of them, who has solicited and obtained favorable information from said Señor Sutter, up to this day, so that no one can dispute their titles. Señor Sutter will give them a copy of this in furtherance of a formal title, with which they will present themselves to this government, to extend the same title in the proper form, and upon corresponding sealed paper; and to establish this in all time I give this document, which will be recognized and acknowledged by all the authorities, civil and military, of the Mexican nation, in this and the other departments. Duly authenticated with the seal of the government and the military seal, in Monterey, this twenty-second of December, 1844. (Signed) Micheltorena." The claimants have produced in evidence a petition and accompanying map, addressed to Governor Micheltorena, and soliciting five leagues of land on the borders of the Sacramento, immediately opposite to the establishment of Señor Sutter. The petition is dated Monterey, April 1st, 1844. On the margin of this petition is an order of reference to the secretary of dispatch. On the back of the document is indorsed an order signed by Manuel Jimeno, directing the petition to be referred to Señor Sutter for information as to its contents, and that it be directed afterwards to the Alcalde of San José, "that he may say what occurs to him." This order, as well as that by the governor in the margin of the petition, is dated March 29th, 1844. Beneath the order of Jimeno is written the "informe" of Sutter, which merely states that the land solicited is unoccupied. This certificate is dated April 15th, 1844. The claimants have also produced in evidence a copy of the general title, with a certificate of Sutter annexed to it, stating it to be a copy delivered to Josefa Martinez "for the ends convenient." This certificate is dated April 7th, 1845. Upon these documents the claimants rely to establish that Josefa Martinez was one of the class in whose favor the general title issued, and that she availed herself of the right therein conferred to obtain a copy of the title certified by Sutter.

The first objection urged on the part of the United States is, that this copy was not furnished as stated in Sutter's certificate; but that the latter has been recently given and antedated. Much testimony has been taken by the United States in support of this allegation. A great part of it, however, is wholly inadmissible. In examining the depositions I shall confine my attention to those parts of them which, by the rules of law, are admissible in evidence. The copy of the general title, with Sutter's certificate annexed, is produced by one Charles Brown. This witness states that in August or September of 1848, Robert T. Ridley, who claimed to be owner of the land with Milton Little, the present claimant, placed in his hands the papers produced by him as collateral security, for moneys advanced to Ridley by the witness, and that they have remained in his possession ever since. The loan to Ridley the witness admits to have been repaid to him in 1849, but he retained the papers in his possession because Ridley did not ask him to redeliver them. On his cross-examination, the witness gives an account of a trip to Sacramento, to see General Sutter, and of his leaving the papers with A. Bartol, by whom they were subsequently returned to him. It is contended by the United States that the object of this trip was to procure the signature of Sutter to the certificate, and that that object was subsequently effected by Bartol, with whom the papers were left for the purpose. Brown states that in a conversation with A. Packard, counsel for claimant, in his office, about two or three months before the taking of his deposition, he mentioned that he had some papers relating to the land. That Packard asked him for them, and he brought them to him. That shortly afterwards he went to Sacramento on business of his own, and also to ask of General Sutter if the signature was genuine. The account given by the witness of the object of this trip, and his own reasons for making it, are by no means satisfactory. When first interrogated as to the other business he had in Sacramento, he refused to answer, but subsequently stated that his business was with Bartol; that he had no previous appointment with him; that he did not know whether he would find him there or not; that they had had some previous conversation about horses, and he went up to see about selling them. When asked as to his reasons for taking such an interest in ascertaining the genuineness of the paper, he replied, that it was only such an interest as he would feel in the affairs of any friend. That he heard through Mr. Bellamy that his friend Mr. Bassham was interested in the claim. That he did not mention to Bel-

lamy that he had the papers, nor was he requested by Bassham to go up to Sacramento. That he had never spoken to the latter on the subject previous to his trip to Sacramento; and that neither Bassham nor any one else had ever spoken to him on the subject of his going to Sacramento before he went. That no person paid him for the trip or offered to do so, nor did any one know he was going. That he never asked any one acquainted with Sutter's signature whether it was genuine or not; that he never asked Sutter himself whether he had signed it, although he had frequently met him since the papers were in his possession; that he has had no reason recently to doubt the genuineness of the signature, and has never doubted it.

These statements of Brown bear strong marks of improbability. It is difficult to believe, from his own account, that his sole motive in seeking General Sutter was to ask if his signature was genuine. That fact could readily have been ascertained by inquiry of any one of the many persons acquainted with it; and the witness himself states that he never doubted it. If he took so deep an interest in the affairs of his friend Bassham, it is strange that he never spoke to him on the subject of the papers, and that he never even mentioned to Bellamy or to Packard his intention to take this disinterested excursion to Sacramento, to ascertain a fact which he admits he never doubted. That his sole object in going to Sacramento was to see Sutter is, I think, evident. He arrived in the middle of the night, and slept on board the steamboat, and he came back by the return boat at two p. m. of the day on which he arrived. That he did not meet Bartol by appointment is admitted by himself. and testified to by Bartol; and the latter is unable to recollect that any conversation took place between them on that day relating to a sale of horses. But the testimony of Bartol discloses unmistakably the real object of Brown's visit to Sutter. This witness states that about seven o'clock on the morning of Brown's arrival he met him in front of the hotel. That in walking up J street they perceived General Sutter in a drinking saloon, in a state of intoxication. Such being his condition, nothing was said about business, although Brown may have expressed his annoyance at the circumstance. That he and Brown were together during the day, and about an hour previous to the departure of the steamer, Brown asked him to write a letter to General Sutter, being unable to do so himself on account of a felon on his finger. He took Brown to the stage office, where the letter was written by one of the agents. Brown then inquired when he (the witness) was going to Marysville, saying that he had important business in San Francisco, and that if he (witness) would hire a team at Marysville and find Sutter when he was so-

ber, he would pay his expenses, at the same time handing him a package containing the letter which had just been written and a document in Spanish. The witness was wholly unable to read the document, but Brown said to him that it was for a tract of land on the other side of the river.

After delivering the package, Brown left Sacramento in the steamer, and about ten days afterwards, the witness being at Marysville, drove out to Hock farm, the residence of Sutter, to see him. Finding him at home, he delivered to him the package and the letter of Brown. General Sutter examined the paper and retired to another room, and after an absence of from five to fifteen minutes he returned and handed the papers back to the witness. When he first presented them to Sutter, he (witness) observed to him that "he was only carrying out the wishes of an old friend, Mr. Charles Brown, by bringing down those papers to him," (Sutter) and Sutter replied, either then or when he returned the papers to the witness, that it afforded him pleasure to render assistance to an old soldier; that "he knew that man," (mentioning some Spanish name) and that "a grant had been given him for certain lands." After receiving the papers from General Sutter, the witness retained them in his possession until he returned them to Brown, about the end of March or first of April. When the papers were delivered, Brown inquired what had been the witness' expenses, to which the latter replied "nothing." The witness does not recollect whether Brown expressed any satisfaction at the reception of the papers. That the paper delivered to Bartol and by him returned to Brown is the same as that now produced by the latter, is positively stated by Brown himself, the claimant's witness. He omits all mention, however, of the letter addressed to Sutter, which accompanied it, but states that he told Bartol to see Sutter and ascertain whether "it was all right."

Upon a careful consideration of the account of the transaction given by these two witnesses, I have been unable to entertain a doubt as to its true character. The extreme improbability of Brown's story has already been alluded to. It is inconceivable that he should have felt so much solicitude to ascertain the genuineness of a signature which was unsuspected by himself, as not only to go to Sacramento for the purpose, but to be willing to pay the expenses of a messenger to Sutter to make the inquiry. If his instructions to Bartol were such as he states, the latter failed to accomplish the objects of his journey; for it does not appear that any inquiry whatever was made by Bartol, at his interview with Sutter, as to the genuineness of the signature, nor did Sutter say a word on the subject. If the only business of Brown or of Bartol with Sutter was to ask him if the signature was his, it would be most natural that Sutter

should have looked at the document and communicated the result of his inspection to Bartol. On the contrary, he reads the letter of Brown and retires to another room, from whence after a short absence he reappears and expresses his pleasure at being able to serve an old soldier and friend. The nature of the service he was rendering is sufficiently clear. It must have been something more than the acknowledgment of a signature of his own. To obtain that, no appeal to ancient friendship could have been necessary, and as the only paper returned by Sutter to Bartol was that which Bartol had just handed to him, Brown, when he received it from Bartol, must have been as unsatisfied as to its genuineness as when he first sought General Sutter to ascertain, as he says, a fact which he also states he never doubted. Bartol, it is true, does not swear that he saw Sutter write the certificate; nor does he admit that he knew the contents of Brown's letter to Sutter. He even states that he had then no idea what Sutter was to do with the paper; nor did he inquire of Brown, as he supposed the letter to Sutter explained all. But even this version of the story is inconsistent with Brown's declaration that he told Bartol to ask Sutter if the paper was "all right;" and whether or not we suppose Bartol to have been aware of the nature of the service expected from Sutter, it is clear that it was something different from answering a simple inquiry whether a signature purporting to be his was genuine. It seems to me that all the circumstances of the transaction point as unmistakably to its true nature as if it had been positively sworn to by witnesses who had seen Sutter in the act of writing the certificate. But there are other considerations which tend to confirm this view. The document in question is produced for the first time by Brown, a witness examined in this court April 3d, 1857, more than four years after the claim was presented to the board. Up to that time no one seems to have known or suspected its existence. Even Bellamy, who testifies that at the request of Josefa Martinez and her husband, and under an agreement with them, he had the petition drawn up, that he presented it to Micheltorena and afterwards to Sutter, and that he took possession of the land under his agreement with Josefa Martinez, does not pretend that any copy of the general title was obtained, or was certified to by Sutter. The mode in which Brown accounts for its possession by him, and its long suppression, is highly improbable. For it can hardly be supposed that if it was placed by Ridley in his hands as security for a loan, it would not have been returned when the loan was paid. The only person to whom Brown states he showed or even mentioned the document, before his trip to Sacramento, is Albert Packard; and he has not been examined. Nor has Sutter's testimony been taken, although

his interests and his feelings would naturally have led him to seek and to insist upon an opportunity of denying and refuting so injurious an accusation. The copy of the general title produced by Brown is sworn by Mr. Bidwell to be in his handwriting. The witness is wholly unable to recollect having made it, and states that he had forgotten every thing about it until it was shown to him on the stand. He recognizes, however, the handwriting, and thinks it must have been delivered to Sutter, for whom he made a considerable number of copies of the general title.

It is evident that the fact of this copy being in Bidwell's handwriting does not bear upon the point in dispute—viz., as to whether the copy was delivered and the certificate attached at the date of the latter. That many copies of the original title may have been prepared by Sutter's direction, in order that they might be delivered when applied for, is probable. I think the testimony which has been reviewed leads us irresistibly to the conclusion that one of these copies having by some means come into the possession of Brown, a certificate of Sutter was attached to it at the time it was presented to Sutter by Bartol. But the testimony of Samuel C. Heaton removes any doubts which might otherwise have been entertained on this point. This witness swears that he accompanied Bartol on his visit to Sutter; that Bartol and Sutter had a little conversation concerning a paper that the former wished Sutter to sign; that Sutter objected but finally consented, took the paper, left the room and returned with the paper. If there was any doubt as to the identity of the paper, the evidence of this witness on that point might be open to criticism. But Bartol and Brown himself admit that the paper given by Brown to Bartol and by the latter presented to Sutter, is the paper now produced. The only question is—Was the object of Bartol's interview to ascertain the genuineness of the signature or to obtain an antedated signature? The testimony of Heaton has merely served to confirm me in a conclusion to which I would independently of it have irresistibly been led. Discarding, then, the copy of the general title and the certificate of Sutter, as affording no evidence of the claimant's title, the only documentary evidence which remains is the petition with the marginal order, the order of reference signed by Jimeno, and the "informe" signed by Sutter. I do not understand that the genuineness of Micheltorena's or Jimeno's signature is disputed. There is, however, a discrepancy in the dates of the several documents for which I have been unable to account. The petition of Josefa Martinez (which it may be remarked is not signed by her) is dated April 1st, 1844. The marginal order of Micheltorena and the order of reference signed Jimeno are both dated March 29th, 1844—three days before the petition

purports to have been written. I have endeavored in vain to conjecture some satisfactory explanation of this circumstance. It might have been supposed that Josefa Martinez, being an ignorant or careless person, had, when drawing the petition, mistaken the date; but Bellamy, the principal witness for the claimant, testifies that the petition and map were drawn up under his direction by Francisco Arce, and that he (the witness) then presented them to the governor, who wrote the marginal order in his presence. Arce was a person of intelligence and consideration, and at one time filled an office under the government. It is singular that both Arce and Bellamy should have fallen into this mistake, or else, if the petition be correctly dated, that the governor and the secretary should have both accidentally antedated the orders signed by them. But, assuming the petition to have been drawn and the orders of reference to have been made as appears on the documents, it is also necessary to bring the petitioner within the class of persons referred to in the general title, to show that previous to the issuing of that document a favorable report of Sutter had been obtained.

The whole case on the part of the claimant fails, unless it satisfactorily appears that the favorable report of Sutter was made at the time it bears date. The evidence on this point consists of the testimony of George W. Bellamy, and the presumption arising from the date affixed to the report, with proof of the genuineness of the signature. But Bellamy, though he swears that General Sutter signed the report in his presence, does not state when it was signed. He adds that "he thinks, though he is not certain, that Mr. Bidwell or Major Reading wrote the body of the report for General Sutter, and then Sutter signed it." The body of the report is admitted to be in the handwriting of Sutter himself. This mistake, which may have arisen from mere inaccuracy of memory, would not of itself justify any inferences unfavorable to the witness. It is proper to notice it, however, among other circumstances to be considered hereafter, upon a just appreciation of which his credibility must depend. As the principal, if not the only evidence with regard to the occupation of the land is that given by Bellamy, the testimony on that subject may now be examined. Bellamy testifies that after Sutter had signed his report, he (witness) returned the paper to Micheltorena, and upon his assurance that the grant would be issued, took possession of the land under an agreement with Josefa Martinez and her husband. That Sutter put him in possession; and that he placed cattle on it, and having borrowed tools from Sutter, made a corral upon it. That afterwards he and Matthews were about to drive some cattle upon it from the Salinas plains, but were prevented by Larkin, to whom Matthews was indebted.

That the revolution which soon after broke out prevented them from getting more cattle; and that he then authorized Robert Ridley, who was living at General Sutter's, to take possession of the rancho, take care of the cattle and establish a ferry, which he did. That Ridley remained on the rancho a little less than a year, when he died. He (Bellamy) then authorized George McDougal to take possession of the property and cattle, which McDougal did, and remained there until 1848 when he left.

To disprove these statements the United States have called a large number of witnesses. Samuel Kyburz testifies that he resided at or near Sacramento from October, 1846, until 1848. That in the summer of 1848, one McDowell settled upon the land opposite the city, and within about a mile of a place which the witness had, by the advice of Sutter, selected for himself. That McDowell was the first person who settled on that side of the river within four or five miles of Sutter's "Embarcadero." He built a house about fifty rods from the bank of the river, and a brush fence to keep his mules in. He had his family with him, who still live there. On being asked whether Bellamy ever built a corral and put cattle on the land, the witness replies that he never saw or heard that he or any person ever did so before McDowell; that he never saw any signs of a settlement previous to McDowell's, nor heard of any. On his cross-examination he states that, as to the years 1844 and 1845, he cannot speak positively from his own knowledge, although he is satisfied in his own mind on the subject, but that from 1846 he is sure no one occupied the land, and there were no cattle on it to his knowledge, except stray cattle. He adds that at that time the settlers on that side of the river were not numerous—being only two within thirty miles—viz., Swat and Hardy; and that Sutter assisted McDowell to make his settlement, and directed the witness to send two ox-teams to haul logs for the house, etc.

Daniel Leahy testifies that he resided at Sutter's fort from October, 1845. until April, 1847. That Juan de Swat had a settlement on the opposite side of the river, near what is now called Washington City. That he was frequently at Swat's place up to the spring of 1846. That there was no other settlement at that time in that vicinity. That he never saw a corral there; if there had been one, he could not have helped seeing it; there might have been some cattle on the plains— he never saw them near the river. That the first settlement after Swat's was made by McDowell. He never heard of any claim or settlement by Matthews, Bellamy, Ridley or George McDougal.

David T. Bird testifies that he came to California in 1844, and has resided here ever since, and has been acquainted with the land claimed in this suit ever since his arrival, In 1844 he was residing on Cache

creek, about twenty miles above Sutter's fort, and he traveled over this tract on his way to the fort, and returned the next day. He passed through or over the tract during the year 1844 five times, which he remembers distinctly, and perhaps oftener. After the Micheltorena war and about May 1st, 1845, he returned to Sutter's fort, and continued there in Sutter's employment until 1846, and between these dates was on the tract ten or twelve times. The witness then states that during all this time there was no settlement or improvement upon the land, except those of Swat, about eight miles below. That he thinks he can assert positively that if there had been a corral on the land, he would have seen it. He further states that McDowell was the first person who settled on the land within eight miles of where Washington now stands. That he knew Bellamy; but that he never to his (witness') knowledge built a corral or put cattle on the land; and that neither Ridley or McDougal ever, to his knowledge, lived there. That the Indian who attended to the ferry, established as the witness understood by General Sutter, lived on the Sacramento side of the river, and transported passengers in a canoe, and this mode of crossing continued until 1848. The witness adds that he has frequently hunted deer and trapped on the tract of land in controversy.

William Gordon testifies that he settled on Cache creek in 1842, about twenty-five miles up the river from Washington, and has lived there ever since. That he is acquainted with the settlements on the river opposite Sacramento and for twenty miles up and down. The first settler was Swat, who settled where Washington now is. The next was Knight, who settled about twenty-five or thirty miles above the site of the present town of Washington; and the next was Hardy, who settled in 1845, about eight miles below Knight's place. That there was no other settlement within thirty miles of Washington until 1847, when McDowell made a settlement under some agreement with Swat, as witness was informed. That he never knew of any settlements made by Matthews. Bellamy, Ridley or McDougal, between the years 1842 and 1847, and if there had been any he should have seen them. That he heard several times during that time of Matthews and Bellamy coming to look for land, but never heard of any settlement or claim.

Margaret Taylor, who is the widow of James McDowell, testifies that in May, 1847, her former husband settled on the land at the place where Washington now is, under an agreement with Swat. That Sutter was present when the agreement was made, and assisted McDowell to build his house by furnishing a team to draw logs, etc., and that at the time of this settlement there was no improvement whatever in that vicinity, on the west bank of the Sacramento; and

her husband continued to reside in the same place until his death in 1849.

Gilbert A. Grant testifies that he resided in 1849 and 1850 on the west bank of the Sacramento, and acted as agent for Sutter, and had opportunities of learning what lands were reputed to have been granted. That he never heard of any grant having been made below Hardy's place, and that he heard of such a claim for the first time about a month before his deposition was taken.

Marcos Vaca testifies that he has lived about fifteen miles from Sutter's fort since 1843. That a trail led from his rancho to the Embarcadero of Sutter's fort, and that he frequently visited McDowell's house and the Embarcadero. That McDowell made his settlement in 1847, and that up to that time there were no buildings or improvements whatever near the Embarcadero, nor does he remember any on or near the road from his rancho to the Embarcadero. He further states that he never heard of any grant or claim concerning the land near the Embarcadero before 1847.

George T. Wyman testifies that he resided at Sutter's fort from 1841 to 1848, and was engaged in hunting and taking care of stock for Captain Sutter. That from 1844 to 1847 he has been on the land adjacent to the Embarcadero so often that it is impossible to state the number of times. That McDowell was the first person who settled or made any improvements on the land. That he has known Bellamy since the day he arrived, and that during the years 1844, 1845 and 1846 he neither built a corral or put cattle on the tract in question; that if he had done so, he (witness) would surely have known it. That in 1846 there was no corral on the north side of the trail to Vaca's ranch (as stated by Major Snyder, hereafter alluded to). That he saw Bellamy frequently, and that from 1846 to 1849 he never heard him set up any claim for the land in question, or say that he had built a corral or placed cattle upon it. He did not however see Bellamy oftener than once a month during the period referred to.

Willard Buzzle testifies that he resided at Sutter's fort from 1841 until 1843; that he returned in 1844 and remained there until 1847. That he was on the tract in controversy a great many times—on an average, once a month. That McDowell was the first person who settled or made any improvement near the present site of Washington, and this was in May or June of 1847. That Bellamy did not, to his knowledge, build a corral or place cattle on the land, between the years 1844 and 1847. That he saw him frequently, being an old acquaintance, and never heard him set up any claim to the land. That there was no corral near the river, as testified by Major Snyder, except a brush corral which he (witness) helped to build for the purpose of catching horses after crossing. This was built in

1844, and in the fall of that year it was fitted up again, as many horses were brought up. That Bellamy did not assist and was not present when it was made or repaired. It was burnt in 1846, after which another was erected for the same purpose.

Nathan Coombs testifies that from 1843 to 1847 he resided on Cache creek, about twenty-five miles from Sutter's fort. That he was frequently at the fort, and that on his way he passed over the tract in controversy. That the first person who made any settlement upon it was McDowell, whom he saw there in 1849. That he acted as guide for Major Snyder in the fall of 1846, from Sonoma to Sutter's fort. That on their way they passed along the trail from Vaca's rancho to the Embarcadero; but that there was no corral on the spot spoken of by Snyder, that he (witness) can recollect. That he has known Bellamy since 1843, and from that year until 1845 met him frequently; and that up to the summer of 1848 he knows positively that Bellamy did not take possession of the tract, build a corral, or place cattle upon it. That a corral was built of brush near the Embarcadero, which was used by various persons when crossing their stock; and that he never heard of the claim of Bellamy and Matthews until within a few weeks.

To the foregoing testimony on the part of the United States may be added that of John Bidwell and Samuel J. Hensley, witnesses on behalf of the claimant. These witnesses state that McDowell was the first person who settled or made any improvements opposite Sacramento city, at the place now called Washington. On the part of the claimant, the only witnesses who corroborate the testimony of Bellamy are Major J. R. Snyder and Joseph Swanson. Major Snyder testifies that in the fall of 1846 he saw a corral on the land opposite Sutter's Embarcadero, and about one hundred and fifty or two hundred yards back from the river. It was about fifteen or twenty yards to the north of the trail commonly traveled in going from Sutter's fort to Sonoma. He was accompanied at the time by Coombs as guide. The corral was readily seen from the trail. It had in it some horses, which the witness supposed to belong to some trappers who were camping on the river. He afterwards passed along the same trail, about July, 1848, when he again observed a corral near the same place, but whether the same one or not he cannot state. He did not observe, however, on either occasion, the house of McDowell. The witness also states that when he crossed the river in 1846 there was no regular ferry. There were Indians who crossed people over.

Joseph Swanson testifies that he passed over the tract in 1844. There was then a corral there, about one hundred to three hundred yards from the river, a little above the Embarcadero. He is unable to state its

size or mode of construction, except that its shape was square or oblong.

From the foregoing abstract of the testimony with regard to the occupation of the land, it is apparent that in every particular, except one, Bellamy's statements are not only not corroborated, but disproved. It is impossible to believe, under the evidence, that Bellamy was put into possession of the land by Sutter; that he placed cattle upon it; that Ridley took possession of it and established a ferry across the river, or that McDougal took possession and remained there until 1848, as stated by Bellamy. Circumstances such as these could not have been unknown to the numerous witnesses who resided in the immediate vicinity. To suppose them to have occurred we must, on the faith of Bellamy's unsupported declarations, attribute to them misstatements which it is difficult to believe not to have been willful.

On one point, Bellamy's evidence is in a slight degree corroborated by the testimony of Major Snyder and Swanson. But these witnesses only testify to the existence of a corral, the object of which is explained by other witnesses, and with the construction of which Bellamy was wholly unconnected. I think that the preponderance of testimony is clearly and decisively against the truth of the statements of Bellamy. It is urged that his testimony is inadmissible on the ground of interest. Whatever force there might have been in that objection, it was not made in season. He was examined and cross-examined without objection. In estimating his credibility however, it ought not to be lost sight of. Bellamy's character has since been impeached by the testimony of several witnesses, and sustained by that of some others of great respectability. If the proofs were more nicely balanced, an inquiry into his general character might be necessary. But where the preponderance of evidence is decisive, the result of such an inquiry could have but little weight. If then we reject the testimony of Bellamy with regard to the occupation of the rancho as untrue, his statement that Sutter signed his report in his presence cannot be received without extreme distrust. We have seen that Bellamy states the body of that report to have been written by Mr. Bidwell or Major Reading. This statement is admitted to be a mistake.

We have also seen that one document at least in this case was written by General Sutter, long since the conquest, and antedated. This fact is of itself sufficient to impair, if not wholly destroy the presumption that might otherwise arise, that the report of Sutter was made at the time it bears date. This presumption and the testimony of Bellamy constitute the only evidence on the part of the claimant to show the time when the report of Sutter was made. No other witness is produced by whom the

petition and report of Sutter were seen prior to 1850. The claimant himself, at the time of filing his petition to the board, seems to have been ignorant or the nature of his title, for he speaks of it in general terms as a grant by Micheltorena to Josefa Martinez, and states that "he has been unable to obtain possession of the said grant, but that Josefa Martinez withholds it from him." Certainly, he does not here refer to the general title, which is the only grant exhibited in this case. That the papers now presented were in existence in 1850, may be admitted. That fact is proved by Bassham and by Mr. Schleiden, who translated them at that time.

But the point to be established is, that Sutter had made a favorable report previously to the date of the general title. The existence of such a report in 1850 no more proves this essential fact, than its existence and production to this court in 1856. Mr. Bassham, the friend of Bellamy, who produces these papers, swears that he received them from Josefa Martinez, or Matthews, her husband, in 1850; and that one of them stated that the papers, together with the grant, had been on deposit with some friend, but that the grant was lost—whether before or after the papers were returned, the witness does not remember. It is to be observed that the witness does not state that the papers are now in the same condition as when received by him. I do not attach much importance, however, to this circumstance, as the inquiry might have been accidentally omitted. But his statement with regard to what Josefa Martinez or her husband told him respecting the grant, deserves more attention. They could hardly have referred to a copy of the general title, for we have already seen that the copy now produced, with the certificate of Sutter, has been recently obtained. If they referred to a grant directly to Josefa Martinez, such as the claimant evidently supposed to exist when he presented his petition to the board, it is clear that they did not claim under the general title of Micheltorena—which is now set up as their original title. I have referred to these alleged declarations because they were put in evidence by the claimant, and because they seem to show that neither Bassham when he obtained the papers, nor Josefa Martinez when she delivered them, had any idea of asserting any rights founded on a petition, a favorable informe of Sutter, and the general title of Micheltorena.

According to Bellamy's account, the petition, after Sutter's report was obtained, was returned to Micheltorena. It is not explained how or when it subsequently passed into the hands of the petitioner. Bellamy also states that upon receiving Micheltorena's assurance that the grant would be issued, he was put into possession by General Sutter. This statement is scarcely credible for several reasons: 1st. The order of Jimeno directed a reference to the Alcalde of San José, as well as to Sutter. It does not appear why a compliance with that order was dispensed with. The report of Sutter merely certifies the land to be vacant. Information would naturally be desired by the governor as to the qualifications of the petitioner, etc., as required by the regulations of 1828. 2d. If Bellamy means to say that he was put into possession by Sutter immediately after the return of the petition to Micheltorena, then Sutter acted wholly without authority, for not only no grant had been issued, but the informes required had not been obtained. If he means to say that he was put in possession after the general title had been issued, it is extraordinary that neither he nor the grantee or her husband applied to Sutter for a copy of the general title. That he did not, may be clearly inferred from his silence on the point. That the copy now produced has been recently prepared, has already been shown. 3d. The land in question was not within Sutter's jurisdiction, but belonged to that of the Alcalde of Sonoma. It is highly improbable that Sutter would have attempted to exercise such a function as that of putting a grantee in possession of land beyond the limits of his own jurisdiction. 4th. If these facts had occurred, Sutter would certainly have remembered them. He has not been examined. On this point, as well as on that relating to the time when he wrote the report, the omission to examine him on the part of the claimant is a pregnant circumstance against him.

After a most careful consideration, I have come to the conclusion that the testimony of Bellamy is not worthy of credit. The alleged occupation of the rancho by him, and the building of the corral, are disproved by such a mass of testimony as to leave no room for doubt on the subject. His statement that Ridley first, and afterwards McDougal, took possession of and remained on the rancho until 1848, and that the former established a ferry, is disproved by the testimony of every other witness examined on the subject—including those produced by the claimant. No one of them ever saw or heard of these persons living on the land, nor was their house or other trace of occupation observed by any one—the corral seen by Major Snyder being shown not to have been built by them, or to have been used for purposes connected with the settlement of the tract. Under all these circumstances, the testimony of Bellamy with regard to the time when Sutter signed his report cannot be regarded as sufficient evidence of the fact; especially, when the testimony of Sutter himself is withheld. The proof, then, of the date of this report is thus found to consist solely in the facts that the instrument has a date attached to it, and that it existed in 1850. But the presumption arising from the date that it was executed on that day, at all times weak, and indulged only in the absence

of suspicious circumstances, is destroyed when we find in the same case a similar paper, executed by the same party, clearly antedated; and where the party who might have testified as to the time when he executed it is within reach, but is not examined. If these observations be just, the claimant has entirely failed to establish by evidence that can be deemed satisfactory the essential fact, that at the date of the general title Josefa Martinez was one of those who had previously solicited lands, and obtained a favorable report from Sutter. But the claimant's counsel rely with apparent confidence on the testimony of Bidwell and Larkin, with reference to the map made by the former.

Mr. Bidwell testifies that, by the request of Governor Micheltorena, he made, in the fall of 1844, a map of the Sacramento valley. This map is not produced, but another is shown to the witness, which he recognizes as a copy of the original "in its general features." On this map the tract claimed in this case is laid down, and marked "Rancho de Bellamy." When cross-examined, the witness states that he is unable to say from what source he derived the information according to which he made his map. "That he does not remember to have seen the papers of Bellamy before they were shown him in court; that it was a matter of general notoriety that Bellamy was trying to get a grant of land there."

Thomas O. Larkin testifies that his impression is that Bidwell made two maps from memory in Monterey. One he gave to the witness, the other to Micheltorena. The former continued in his possession until it was produced before the board in evidence, and it has since remained on file in the surveyor general's office. A traced copy of this map is exhibited.

I have not been able to attribute to this testimony the force assigned to it by the counsel. Assuming that the map produced is an exact copy of that made by Bidwell in 1844, it merely shows that at that time he supposed this tract to be "the Rancho de Bellamy." Had he made the same statement orally or by letter, it would hardly be received as proof that Bellamy had obtained a grant for it. But the maker of the map is himself produced and disclaims all knowledge on the subject. That he did not derive his information on the subject from the archives is evident, for the archives contain no information respecting it. That he did not see the original documents is clear from his own admission, and from the fact that the application was made by, and the title, if any, was in favor of Josefa Martinez, and not of Bellamy. He himself sufficiently accounts for the designation of this tract on the map as the "Rancho de Bellamy," by his statement that "it was notorious that Bellamy was trying to get a grant for it." It was in all probability this fact which led him to mark the land on his map as Bellamy's rancho. The map may perhaps be regarded as proof that at that time Bellamy, or Josefa Martinez and her husband, with whom he was interested, were petitioning for the land; and I do not understand that fact to be questioned. But it does not prove that they ever received a grant, or that Sutter's favorable report had been obtained before the general title issued. To the unsworn declaration of Bidwell, as expressed by the map, that this tract was the rancho of Bellamy, may not unfairly be opposed the declarations of Sutter, made subsequently, that the land was vacant and ungranted, and his advice and assistance to McDowell to settle on it as such; as also the statement of Grant and other witnesses, who swore that they never heard of his claim.

On the whole, I consider that the claimant has failed to establish by satisfactory proofs that his assignor was one of the class in whose favor the general title issued, and that on this ground the claim should be rejected. But if this were less clear, I am of opinion that the neglect to occupy, or to render to the former government any of the considerations upon which the grant was made, if at all, establishes as a matter of fact and of law that she had abandoned all claim to the land before the change of sovereignty. That she never settled upon it, inhabited it, nor ever built a corral upon it, nor did any one else in her behalf, has been shown. That all the neighbors, including Sutter himself, regarded it as vacant up to the time of McDowell's settlement, is abundantly proved; and the omission to obtain a copy of the general title indicates that the claim was probably abandoned as worthless, if it does not justify the inference to which the failure of proofs has conducted us, that she was not one of the class in whose favor it issued. In examining this case, I have sought to confine myself to the proofs which I consider legally admissible. Upon a full consideration, I am of opinion that the claim ought not to be confirmed.